# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| In re:<br><br>PETER JOON HUH,<br><br>      Debtor. | Chapter 7<br><br>Case No. 24-11575<br><br>Hon. Michael B. Slade |
| NANCY RUONAN SNOW,<br><br>      Plaintiff,<br>v.<br><br>PETER JOON HUH,<br><br>      Defendant. | Adv. Pro. No. |

**COMPLAINT TO DETERMINE DISCHARGEABILITY
OF DEBT PURSUANT TO 11 U.S.C. § 523(a)(2)(A)**

Nancy Ruonan Snow ("Ms. Snow" or "Plaintiff"), by and through her undersigned counsel, hereby files this Complaint against debtor Peter Joon Huh ("Mr. Huh" or the "Debtor") to determine the dischargeability of certain debts, and in support thereof hereby alleges as follows:

**JURISDICTION AND VENUE**

1. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 157 and 1334(b) because this adversary proceeding arises in and is related to a case under title 11 of the United States Code (the "Bankruptcy Code").

2. This matter is a "core" proceeding to be heard and determined by the Court pursuant to 28 U.S.C. § 157(b)(2).

3. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**THE PARTIES**

4. Ms. Snow is an individual residing in the State of Nevada.

5. Mr. Huh is the Debtor in the above-referenced chapter 7 case and an individual residing in the State of Illinois.

## FACTUAL BACKGROUND

**I.  Ms. Snow's Relationship with the Debtor and the IRS Loan**

6. In or around August 2018, Ms. Snow met the Debtor at a work conference in Las Vegas.

7. The Debtor represented to Ms. Snow that he was separated from his wife, and the two began a romantic relationship.

8. The Debtor visited Ms. Snow in Las Vegas twice in October 2018, and once in December 2018.

9. The Debtor again visited Ms. Snow in Las Vegas between January 3, 2019 to January 6, 2019.  On the last day of his visit, shortly before leaving for the airport, the Debtor confessed to Ms. Snow that he owed $50,000.00 to the Internal Revenue Service (IRS) for unpaid taxes.

10. The Debtor told Ms. Snow that he was extremely concerned about being unable to pay the IRS.

11. The Debtor asked Ms. Snow to lend him the $50,000.00 necessary to pay off his debts to the IRS (the "IRS Loan").

12. The Debtor represented to Ms. Snow that the IRS Loan would only be used to payoff his outstanding debts to the IRS.

13. Relying on this representation, and in an effort to help ease the Debtor's stress, Ms. Snow wrote a personal check for $50,000.00 in favor of the Debtor.

14. The Debtor promised to repay Ms. Snow in full within one (1) year. The Debtor memorialized the $50,000.00 IRS Loan from Ms. Snow, as well as his promise to repay her within one (1) year, in an email dated January 6, 2019.

15. A true and correct copy of the January 6, 2019 email is attached hereto as **Exhibit A**.

16. Shortly after obtaining the IRS Loan, the Debtor terminated his romantic relationship with Ms. Snow.

17. Upon information and belief, the Debtor never used the funds from the IRS Loan to pay his IRS debts.

18. In or around March of 2019, Ms. Snow's father, who lives in China, was diagnosed with cancer and required surgery. In an effort to help pay for her father's medical expenses, Ms. Snow reached out to the Debtor via text message and asked him to begin making payments on the IRS Loan. The Debtor ignored Ms. Snow's pleas.

19. On or around March 26, 2019, Ms. Snow traveled to Chicago in person to request expedited repayment on the IRS Loan from the Debtor.

20. While in Chicago, the Debtor paid Ms. Snow $5,000.00 and promised to make payments to pay off the full $50,000.00 by January 6, 2020 as per the terms of the January 6, 2019 email.

21. In or around April 2019, Ms. Snow traveled back to China to be with her father while he underwent surgery.

22. Upon returning from China, around May 2019, Ms. Snow reached out to the Debtor once again about making payments so that she could continue to help pay for her father's medical expenses.

LEGAL\75668626\1

23. The Debtor responded by sending two Zelle payments totaling $1,500.00 to Ms. Snow.

## II. The Gambling Debts Loan

24. In late 2019, Ms. Snow contacted the Debtor to remind him of the upcoming maturity date on the IRS Loan.

25. At that time, the outstanding balance under the IRS Loan was $43,500.00.

26. In response, the Debtor called Ms. Snow and informed her, through tears, that he could not pay her back because he owed $100,000.00 in gambling debts to a casino in the State of Nevada. He told her that he would go to jail if he did not pay back his gambling debts because, in Nevada, unpaid casino markers can result in criminal charges.

27. As a resident of Las Vegas, Ms. Snow is aware of the laws relating to unpaid casino markers, and she knew that a person's failure to pay casino marker debts could result in criminal liability.

28. In December of 2019, shortly before the Debtor was required to repay Ms. Snow the outstanding balance under the IRS Loan, the Debtor traveled to Las Vegas to see Ms. Snow in person.

29. The Debtor apologized to Ms. Snow for breaking up with her, and told her that he wanted to make amends and rekindle their romantic relationship.

30. The Debtor again represented to her that he would go to jail if he did not pay back his gambling debts.

31. When Ms. Snow suggested that the Debtor consider filing for bankruptcy, he told her that he could not file bankruptcy because, as a licensed attorney, a bankruptcy record would cause him to lose his job and become unemployable.

LEGAL\75668626\1

32. The Debtor represented to Ms. Snow that if he was forced to file for bankruptcy, or if he was criminally prosecuted by the State of Nevada, he would be unable to pay her the $43,500.00 outstanding on the IRS Loan.

33. The Debtor then asked Ms. Snow to lend him the money needed to pay off his gambling debts.

34. He told Ms. Snow that he was extremely ashamed of his gambling debt. In order to persuade Ms. Snow to loan him the additional funds, the Debtor promised her that he would never gamble again and, if she were to loan him the funds, that he would live below his means in order to pay her back.

35. Relying on the Debtor's promises to never gamble again and to live below his means, and afraid that she would never been repaid if the Debtor lost his job or went to jail, Ms. Snow agreed to loan the Debtor an additional $100,000.00 (the "__Gambling Debt Loan__").

36. She loaned the Debtor these funds for the express purpose of settling his gambling debts and to keep him out of jail so that he could repay her.

37. Ms. Snow would not have loaned the Debtor $100,000.00 if she knew that he would continue to gamble.

38. Ms. Snow also agreed not to charge the Debtor any interest or additional fees on the outstanding amounts owed to her by the Debtor.

39. On December 31, 2019, Ms. Snow deposited $100,000.00 from her personal checking account with JPMorgan Chase into the Debtor's JPMorgan Chase account.

40. The Debtor memorialized the Gambling Debt Loan by email dated December 31, 2019. A true and correct copy of the December 31, 2019 email is attached hereto as **Exhibit B**.

41. The Debtor promised to pay off both the IRS Loan and the Gambling Debt Loan by making monthly payments of $2,400.00 to Ms. Snow beginning in February 2020 and

continuing for eighteen (18) months, and then monthly payments of $2,500.00 starting in August 2021 and continuing for forty (40) months.

42. Also on December 31, 2019, the Debtor executed two confessions of judgment in favor of Ms. Snow as security for the loans. The first confession of judgment was made in the amount of $43,500.00 – the outstanding balance on the IRS loan, less any payments made by the Debtor subsequent to execution. The second confession of judgment confessed judgment in the amount of $100,000.00 for the outstanding balance of the Gambling Debt Loan, less any payments made by the Debtor subsequent to execution. True and correct copies of the confessions of judgment are attached hereto as **Group Exhibit C**.

43. As further security for the IRS Loan and Gambling Debt Loan, the Debtor promised to take out a term life insurance policy from Ameritas in the amount of $150,000.00 and make Ms. Snow the owner and beneficiary of the policy.

44. The Debtor and Ms. Snow met with an insurance agent in Las Vegas in early 2020 so that the Debtor could fill out the necessary paperwork.

45. The Debtor later underwent the requisite physical examination in Illinois.

46. Finally, in or around July of 2020, the Debtor completed the necessary steps to obtain the $150,000.00 term life insurance policy from Ameritas.

47. The policy required a premium payment of $410.00 per year to maintain the life insurance policy, which the Debtor promised to pay.

**III. The Consolidation Loan**

48. The Debtor made the requisite monthly payments of $2,400 for several months.

49. However, in or around April of 2020, the Debtor expressed to Ms. Snow that he was having difficulties maintaining the $2,400.00 per month payment despite his high income as a lawyer.

6

50. Ms. Snow asked the Debtor why he was having difficulty making the requisite payments and the Debtor revealed that he had taken out a number of high interest-bearing commercial loans.

51. The Debtor represented to Ms. Snow that the monthly payments on his significant high interest-bearing commercial debt made it impossible for him to make the $2,400.00 monthly payments to Ms. Snow.

52. The Debtor had never disclosed these significant commercial debts to Ms. Snow prior to this point in time. Had he done so, and had she known that these debts would make it impossible for him to make the requisite payments to her under the terms of the IRS Loan and Gambling Debt Loan, she would have never agreed to loan him the funds.

53. When Ms. Snow questioned why the Debtor took out these loans, the Debtor blamed his wife.

54. At all relevant times, the Debtor repeatedly led Ms. Snow to believe that his wife was aware of their relationship and had no issue with it. He represented to her that he and his wife were in a "paper marriage" and had only stayed legally married for the sake of their children.

55. However, the Debtor explained that his wife nevertheless demanded that they maintain the image of status and live a luxurious lifestyle. The Debtor explained, and Ms. Snow understood, that as part of the Debtor's Korean culture, he was expected to provide this lifestyle for his immediate family and to pay for his in-laws. The Debtor represented that his wife insisted that he buy her luxury goods, including designer purses and jewelry, pay for nice dinners, and pay for their family and his wife's parents to take luxury vacations together.

56. The Debtor represented that he was forced to take out the loans in order to meet these expectations.

LEGAL\75668626\1

57. In connection with their conversations about the Debtor's outstanding debts, on June 25, 2020, the Debtor sent Ms. Snow an Excel spreadsheet via email which allegedly detailed his outstanding debts, including his high interest-bearing commercial loans and a number of loans from family and friends.

58. The Debtor represented to Ms. Snow that the spreadsheet, which reflected approximately $351,078.41 in outstanding debts, was an accurate reflection of his current debts.

59. A true and correct copy of the Excel spreadsheet is attached hereto as **Exhibit D**.

60. The Excel spreadsheet also revealed that the Debtor was paying approximately $7,179.56 per month towards eleven (11) different commercial loans. It also reflected approximately $166,200 in loans from friends and family.

61. The Debtor again represented to Ms. Snow that the monthly payments and outstanding balance on these high interest commercial debts made it impossible for him to get ahead of his debts and continue paying Ms. Snow $2,400.00 per month.

62. At this point, the Debtor had made a total of $9,600.00 in monthly payments towards the IRS Loan and Gambling Debt Loan.

63. The Debtor then asked Ms. Snow if she would consolidate his loans and become his sole creditor. He represented that this course of action would allow him to pay her a monthly payment in a similar amount to that total amount which he was forced to pay other creditors each month.

64. Ms. Snow is single mother to two middle school-aged children, and works full time. She told the Debtor that she did not have enough money to consolidate the Debtor's debt.

65. The Debtor persisted in his requests. He represented to Ms. Snow that he would never be able to pay her back the money he owed her unless she consolidated his debts.

66. The Debtor again represented to Ms. Snow that if she consolidated his debts, he could enter into a payment plan with her and pay her over $8,000.00 per month—essentially the amount that he was paying to other creditors each month.

67. When Ms. Snow explained that she would have to refinance her home to consolidate the Debtor's debts, the Debtor even offered to pay for her refinancing fees of around $33,000.00 by adding that amount to his outstanding amounts owed.

68. Ultimately, the Debtor convinced Ms. Snow to refinance her home and her investment property, as well as sell off stocks from her retirement account to raise the necessary funds.

69. Ms. Snow felt she had no choice but to agree to consolidate the Debtor's debts. The Debtor had made it clear that he would not make any more payments to Ms. Snow unless she helped him and she was terrified of losing the money that she had already loaned to him.

70. However, Ms. Snow's agreement to loan the Debtor additional funds to consolidate his debts was expressly conditioned on the Debtor making her a promise that he would not take out any additional loans.

71. As a single mother with two school-aged kids, Ms. Snow was deeply concerned that she would not be paid back if the Debtor took out any new loans. She repeatedly expressed her concerns to the Debtor and explained that she would only be willing to help him consolidate his debts if he maintained his own borrowing power so that he could help her financially if needed.

72. The Debtor represented that he understood her concerns and promised Ms. Snow that he would not take out any additional loans before paying back the Loans in full. Ms. Snow relied on this promise in agreeing to loan the Debtor an additional $330,000.00 to consolidate his debts.

73. Between June and July 2020, Ms. Snow sent four (4) payments totaling $330,000.00 (the "Consolidation Loan" and together with the IRS Loan and the Gambling Debt Loan, the "Loans") to the Debtor's JPMorgan Chase account as follows: $50,000.00 on June 24, 2020; $80,000.00 on June 25, 2020; $95,000.00 on July 20, 2020; and $105,000.00 on July 28, 2020.

74. The Debtor promised to make monthly payments of $8,040.00 to Ms. Snow to repay the Loans.

75. In agreeing to loan the Debtor an additional $330,000.00, Ms. Snow relied on the Debtor's promise that he would not take out any additional loans and his promise to make monthly payments of $8,040.00. She would not have made the Consolidation Loan to the Debtor absent these promises.

76. Also, at this point in time, Ms. Snow and the Debtor were in a romantic relationship. Ms. Snow specifically expressed to the Debtor that she would not have done this for someone who was just a friend.

77. That said, Ms. Snow also had no reason to believe that the Debtor would be unable to make the promised monthly payments because he was employed as a partner of a law firm in Chicago. He represented to her that his annual income was around $225,000.00, and that he would have sufficient funds each month to make the requisite payments – especially since Ms. Snow would be his sole creditor.

78. As security for the Loans, the Debtor told Ms. Snow that he would prepare a new last will and testament, naming Ms. Snow as the first beneficiary of his estate. The Debtor represented to Ms. Snow that the last will and testament would ensure that she got paid back in full, even in the unlikely event of him passing away, because his probate estate would include his Marital Residence (term defined below) and he would be entitled to half of the equity in the home.

10

79. In or around late August 2020, less than two months after the Debtor had persuaded Ms. Snow to loan him an additional $330,000.00, the Debtor terminated their romantic relationship once again.

80. The Debtor terminated their romantic relationship after Ms. Snow discovered that the Debtor had lied to her about his marriage status. Specifically, Ms. Snow discovered that the Debtor had misled her about his wife's knowledge of their relationship and she became upset with him for his deceit.

81. In response, the Debtor told Ms. Snow that he had decided to terminate their relationship and stay in his marriage for his children's sake. He requested that Ms. Snow have zero contact with him going forward.

82. The Debtor also threatened that if Ms. Snow ever revealed their relationship to his wife, he would never repay Ms. Snow the money she had loaned to him.

83. Concerned that the Debtor would cease making payments on the Loans due to the change in their relationship status, Ms. Snow requested additional collateral from the Debtor.

84. This request prompted the Debtor to finally execute the promised Illinois Last Will and Testament, on or around September 21, 2020, naming Ms. Snow as the first beneficiary of his estate.

85. A true and correct copy of the Debtor's Last Will and Testament is attached hereto as **Exhibit E**.

86. On September 28, 2020, the Debtor wrote Ms. Snow a long email promising that he would repay her despite the separation. He thanked her for agreeing to keep his secret from his wife.

87. After the September 28, 2020 letter, Ms. Snow ceased communication with the Debtor per the Debtor's request.

88. On January 3, 2021, at Ms. Snow's insistence, the Debtor finally sent Ms. Snow an email memorializing their Consolidation Loan agreement, and the Debtor's promise to pay Ms. Snow $8,040 per month until January 2026. The email also reflects that the outstanding on the Loans as of January 3, 2021 was $482,400.00.

89. A true and correct copy of the January 3, 2021 email is attached hereto as **Exhibit F**.

90. Between August 2020 and December 2021, the Debtor made the requisite monthly payments on the Loans.

91. However, since the parties were no longer in regular communication, Ms. Snow requested additional security on the Loans from the Debtor. In response, the Debtor promised to execute another confession of judgment for the outstanding balance of the Loans.

92. On December 3, 2021, the Debtor finally executed the promised Confession of Judgment (the "Confession of Judgment"), thereby confessing judgment in favor of Ms. Snow and authorizing the entry of judgment in the amount of $393,960.00, less any payments made by the Debtor subsequent to execution.

93. A true and correct copy of the Confession of Judgment is attached hereto as **Exhibit G**.

### IV. The Debtor's Divorce

94. Between January 2021 and March 2022, the Debtor made sporadic monthly payments of $8,040.00 to Ms. Snow.

95. However, in mid-March 2022, the Debtor called Ms. Snow and informed her that he had lost his job. He also represented that his wife had filed for divorce because he could no longer contribute to their joint bank account and fund their family's lifestyle.

96. The Debtor told Ms. Snow that he was feeling suicidal because of the divorce. He also represented to Ms. Snow that he was unable to make the requisite monthly payments in the amount of $8,040.00 until the divorce was over.

97. The Debtor asked Ms. Snow to refrain from filing the Confession of Judgment because he planned to conceal the debt from his divorce case.

98. To convince Ms. Snow to hold off on filing the Confession of Judgment, the Debtor represented to Ms. Snow, once again, that he held a one-half interest in his Marital Residence (term defined below), and that there was approximately $500,000.00 of equity in the home.

99. He also represented that he was going to petition to the divorce court to sell the Marital Residence (term defined below), and that he would pay Ms. Snow back using the funds from the sale of the property.

100. Ms. Snow asked the Debtor for a copy of the financial affidavit he had filed with the divorce court in order to better understand his financial situation. In response, the Debtor provided her with a copy of his affidavit, as well as some copies of his bank account statements.

101. Upon reviewing these financial documents, Ms. Snow learned that the Debtor had taken out additional loans, including a Sofi loan, that he had granted a mortgage on the property that he shares title to with his mother and in which his mother resides, and that he had registered for various new credit cards.

102. In other words, the Debtor broke his promise to Ms. Snow to not take out any additional loans or credit prior to paying back the Loans in full.

103. Ms. Snow also learned that the Debtor was indebted to the Wynn Las Vegas casino and The Cosmopolitan of Las Vegas casino, in the total amount of $150,000.00 for passing bad markers.

LEGAL\75668626\1

104. Once again, the Debtor had lied to Ms. Snow and continued to gamble and amass significant gambling debts despite his express promise in December 2019 to never gamble again.

**V.  The Judgment**

105. The Debtor also stopped making monthly payments to Ms. Snow in March 2022.

106. Following his wife's petition for divorce, the Debtor would frequently call Ms. Snow to talk about his divorce.  He also made efforts to rekindle their romantic relationship.

107. Despite his failure to make the requisite monthly payments, he repeatedly asked Ms. Snow to wait on filing the Confession of Judgment.

108. In spring of 2022, the Debtor received a pre-distribution from his marital estate and used a portion of those funds to make a payment to Ms. Snow.

109. In or around October 2022, Ms. Snow was counselled by her attorney to file the Confession of Judgment to protect herself.

110. On October 24, 2022, the Confession of Judgment was filed with the Clerk of the District Court of the Eighth Judicial District of the State of Nevada in the civil case styled *Nancy R. Snow v. Peter J. Huh*, Case No. A-22-860290-C (the "Foreign Judgment").

111. The Debtor became extremely angry with Ms. Snow for filing the Confession of Judgment and demanded that she withdraw the filing. She refused.

112. The Debtor made no further monthly payments towards the balance of the Loans.

113. Throughout the Debtor's divorce proceedings, it became clear to Ms. Snow that the Debtor had not been honest with her about his financial condition.  She also observed that the Debtor was not being fully transparent with the divorce court about his finances.

114. She felt that the Debtor was only maintaining a relationship with her in order to prevent her from executing on the Foreign Judgment.

LEGAL\75668626\1

115. Ultimately, Ms. Snow made the decision to retain an attorney based in Illinois to help her collect on the Foreign Judgment.

116. On August 10, 2023, Ms. Snow's former counsel filed to register the Foreign Judgment in the Circuit Court of Cook County, Illinois, thereby initiating the case styled *Nancy R. Snow v. Peter J. Huh*, Case No. 2023L050425 (the "Illinois Enforcement Action").

117. The Debtor and Ms. Snow have had no relationship since she initiated the Illinois Enforcement Action.

118. On September 19, 2023, the court in the Illinois Enforcement Action entered a Memorandum of Judgment in Ms. Snow's favor and against the Debtor in the amount of $346,151.62 (the "Judgment").

119. A true and correct copy of the Judgment is attached hereto as **Exhibit H**.

120. The Debtor, an attorney himself, did not respond to any of the court filings in the Illinois Enforcement Action.

121. On or around November 3, 2023, the Judgment was recorded against the following real properties: (1) 2464 Hampton Ln, Northbrook, Illinois 60062 (the "Marital Residence"), and (2) the Debtor's mother's home at 2020 N Old Hicks Road, A6, Palatine, Illinois 60074 ("Palatine Apartment").

**VI. The Debtor's Bankruptcy Filing**

122. On August 8, 2024, the Debtor filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code, thereby commencing the above-captioned bankruptcy case.

123. Ms. Snow is listed on the Debtor's Schedule D as a holder of a disputed claim in the total amount of $346,151.62, which is supported by $178,000 in collateral from the Palatine Apartment. [*See* Dkt. No. 1, Sch. D., 2.1.] The Marital Residence is not listed on the Debtor's

15
LEGAL\75668626\1

schedules, but the property is the subject of the Debtor's claim to his marital estate. [*See* Dkt. No. 1, Sch. A/B #34.]

124. The Debtor's initial 341 meeting of creditors was held on September 12, 2024. [Dkt. No. 6.] At the 341 meeting, it was revealed that the Debtor failed to disclose certain debts and transfers on his schedules and Statement of Financial Affairs. For example, the Debtor failed to disclose that he sold his Rolex watch within approximately six (6) months of the Petition Date.

125. Also upon information and belief, the Debtor failed to disclose his agreement with the Clark County District Attorney's office of Clark County, Nevada to defer criminal prosecution against the Debtor for the drawing and passing of bad checks/markers to The Cosmopolitan of Las Vegas and Wynn Las Vegas casinos.

126. Upon further information and belief, the deferred prosecution was dependent upon the Debtor paying the sum of $2,454.00 per month to the Bad Check Division Unit, via money order/cashier's check, commencing on or around October 15, 2023. No such payments were disclosed in the Statement of Financial Affairs.

127. At the end of the 341 meeting on September 12, 2024, the Chapter 7 trustee requested that the Debtor file amended schedules to capture these debts and transfers and others. To date, the Debtor has failed to do so.

128. The Chapter 7 trustee has continued the Debtor's 341 meeting several times. The 341 meeting has not yet concluded.

## COUNT I
### (11 U.S.C. § 523(a)(2)(A) – Judgment)

129. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 128 as if fully set forth herein.

16

130. Section 523(a)(2)(A) provides that debts "for money …obtained by—(A)false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition" are not dischargeable.

131. The Judgment is comprised of the outstanding amounts owed to Ms. Snow by the Debtor on the IRS Loan, the Gambling Debt Loan, and the Consolidation Loan.

132. With respect to the IRS Loan, the Debtor falsely represented that he would use the $50,000.00 loaned to him by Ms. Snow to pay his alleged outstanding tax liabilities to the IRS.

133. The Debtor also falsely represented that he would repay the IRS Loan in full by January 6, 2020.

134. Ms. Snow justifiably relied on these false representations in agreeing to loan the Debtor $50,000 to pay off his alleged IRS debts. At the time, Ms. Snow and the Debtor were in a romantic relationship and she had no reason to believe that he would fabricate a $50,000 debt to the IRS.

135. Upon information and belief, the Debtor did not use the proceeds of the IRS Loan to pay the IRS.

136. In connection with the Gambling Debts Loan, the Debtor falsely represented that he would use the $100,000.00 loaned to him by Ms. Snow to pay his gambling debts and to avoid prison.

137. The Debtor falsely represented to Ms. Snow that he would never gamble again and that he would live below his means in order to pay her back promptly. It is apparent from the Debtor's subsequent financial records and gambling debts that he had no intention of keeping his promises to Ms. Snow.

138. The Debtor falsely represented that he would repay the $100,000.00 Gambling Debt Loan made to him by Ms. Snow. The Debtor also falsely represented that he would make monthly

17

payments in the amount of $2,400.00 to Ms. Snow every month for 18 months, and then monthly payments of $2,500.00 starting in August 2021 for forty (40) months.

139. Ms. Snow would not have loaned the Debtor $100,000.00 without his representation that he would use the funds to pay his gambling debts or his promise to her that he would never gamble again.

140. Once again, Ms. Snow justifiably relied on the Debtor's false representations in making the Gambling Debt Loan.

141. Finally, with respect to the Consolidation Loan, the Debtor falsely represented that he would not take out any additional loans or credit prior to paying back Ms. Snow in full for the Loans.

142. Further, in order to induce her to refinance her home and sell off stock to loan him the necessary funds, the Debtor falsely represented that he would make monthly payments of $8,040.00 to Ms. Snow to repay the outstanding balance of the Loans.

143. The Debtor also falsely represented that he would pay the annual premiums to maintain the Ameritas life insurance policy that he had taken out as security for the Loans.

144. Ms. Snow justifiably relied upon these representations in loaning the Debtor the funds under the Consolidation Loan.

145. As a result of Ms. Snow's justifiable reliance on the Debtor's false representations, Ms. Snow has sustained a loss in the amount of the Judgment.

146. Accordingly, Ms. Snow seeks a determination that the Judgment is a non-dischargeable debt pursuant to 11 U.S.C. § 523(a)(2)(A).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment against the Debtor granting the following relief:

A. On Count I of the Complaint, judgment in favor of Plaintiff Nancy R. Snow and against the Debtor Peter J. Huh, determining that the amount of the Judgment be deemed a non-dischargeable debt pursuant to 11 U.S.C. § 523(a)(2)(A); and

B. Granting Plaintiff such other and further relief as this Court may deem just and equitable.

Dated: February 12, 2025

Respectfully submitted,

NANCY RUONAN SNOW

By: */s/ Christina M. Sanfelippo*
        One of her attorneys

Brian L. Shaw
Christina M. Sanfelippo
COZEN O'CONNOR
123 N. Wacker Dr., Suite 1800
Chicago, IL 60606
Tel: 312-382-3100
bshaw@cozen.com
csanfelippo@cozen.com